UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| TIMOTHY D., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:18-cv-02709-DLP-SEB |
| | ) | |
| ANDREW M. SAUL Commissioner of the Social Security Administration, | ) ) | |
| | ) | |
| Defendant. | ) | |

**O**RDER ON **C**OMPLAINT FOR **J**UDICIAL **R**EVIEW

Plaintiff Timothy D.[1] seeks judicial review of the denial by the Commissioner

of the Social Security Administration ("Commissioner") of his application for Social

Security Disability Insurance Benefits ("DIB") under Title II and for Supplemental

Security Income ("SSI") under Title XVI of the Social Security Act ("the Act"). *See* 42

U.S.C. §§ 423(d), 405(g). For the reasons set forth below, this Court hereby

**AFFIRMS** the ALJ's decision denying the Plaintiff benefits.

I.    **P**ROCEDURAL **H**ISTORY

On February 11, 2010, Timothy filed for disability and disability insurance

benefits, alleging that his disability began on June 6, 2008. Timothy's claim was

denied initially on April 20, 2010, and upon reconsideration on July 28, 2010.

Administrative Law Judge ("ALJ") Angela Miranda held a video hearing on August

---

[1] The Southern District of Indiana has adopted the recommendations put forth by the Court Administration and Case Management Committee regarding the practice of using only the first name and last initial of any non-government parties in Social Security opinions. The Undersigned has elected to implement that practice in this Order.

1

23, 2011 and issued an unfavorable decision on November 29, 2011, finding that Timothy was not disabled as defined in the Act. On October 18, 2012, the Appeals Council vacated and remanded the ALJ's decision after it received additional evidence.

On September 24, 2013, ALJ Angela Miranda held another video hearing, and issued an unfavorable decision on August 26, 2014, finding that Timothy was not disabled under the Act. The Appeals Council denied review on March 14, 2016 and Timothy filed a civil action in the United States District Court for the Southern District of Indiana on May 16, 2016. On July 31, 2017, The Honorable Jane Magnus-Stinson vacated the ALJ's decision and remanded the matter for further proceedings. On December 5, 2017, the Appeals Council evaluated the Court's opinion and remanded the case to a different ALJ to conduct the further proceedings.

On May 23, 2018, ALJ Blanca de la Torre conducted a hearing, where Timothy, a medical expert, and a vocational expert testified. On June 29, 2018, ALJ de la Torre issued an unfavorable decision finding that Timothy was not disabled as defined in the Act. Timothy did not file written exceptions to the ALJ's decision and, therefore, the ALJ's opinion is the final decision of the Commissioner. Timothy now requests judicial review of the Commissioner's decision. *See* 42 U.S.C. § 1383(c)(3).

## II.  STANDARD OF REVIEW

To prove disability, a claimant must show he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or

2

mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A).  To meet this definition, a claimant's impairments must be of such severity that he is not able to perform the work he previously engaged in and, based on his age, education, and work experience, he cannot engage in any other kind of substantial gainful work that exists in significant numbers in the national economy. 42 U.S.C. § 423(d)(2)(A). The Social Security Administration ("SSA") has implemented these statutory standards by, in part, prescribing a five-step sequential evaluation process for determining disability. 20 C.F.R. § 404.1520. The ALJ must consider whether:

> (1) the claimant is presently [un]employed; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) the claimant's residual functional capacity leaves [him] unable to perform [his] past relevant work; and (5) the claimant is unable to perform any other work existing in significant numbers in the national economy.

*Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005) (citation omitted). An affirmative answer to each step leads either to the next step or, at steps three and five, to a finding that the claimant is disabled. 20 C.F.R. § 404.1520; *Briscoe*, 425 F.3d at 352. A negative answer at any point, other than step three, terminates the inquiry and leads to a determination that the claimant is not disabled. 20 C.F.R. § 404.1520. The claimant bears the burden of proof through step four. *Briscoe*, 425 F.3d at 352. If the first four steps are met, the burden shifts to the Commissioner at step five. *Id.* The Commissioner must then establish that the

claimant—in light of his age, education, job experience and residual functional capacity to work—is capable of performing other work and that such work exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. § 404.1520(f).

The Court reviews the Commissioner's denial of benefits to determine whether it was supported by substantial evidence or is the result of an error of law. *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001). Evidence is substantial when it is sufficient for a reasonable person to conclude that the evidence supports the decision. *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004). The standard demands more than a scintilla of evidentiary support but does not demand a preponderance of the evidence. *Wood v. Thompson,* 246 F.3d 1026, 1029 (7th Cir. 2001). Thus, the issue before the Court is not whether Timothy is disabled, but, rather, whether the ALJ's findings were supported by substantial evidence. *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995).

In this substantial-evidence determination, the Court must consider the entire administrative record but not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Nevertheless, the Court must conduct a critical review of the evidence before affirming the Commissioner's decision, and the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues, *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *see also Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

4

When an ALJ denies benefits, he must build an "accurate and logical bridge from the evidence to his conclusion," *Clifford*, 227 F.3d at 872, articulating a minimal, but legitimate, justification for his decision to accept or reject specific evidence of a disability. *Scheck v. Barnhart,* 357 F.3d 697, 700 (7th Cir. 2004). The ALJ need not address every piece of evidence in his decision, but he cannot ignore a line of evidence that undermines the conclusions he made, and he must trace the path of his reasoning and connect the evidence to his findings and conclusions. *Arnett v. Astrue,* 676 F.3d 586, 592 (7th Cir. 2012); *Clifford v. Apfel,* 227 F.3d at 872.

### III.   BACKGROUND

#### A.  Factual Background

Timothy was 50 years old as of his date last insured in June 2014. [Dkt. 8-13 at 20 (R. 680).] He has a high school education and completed one year of college. [Dkt. 8-13 at 37 (R. 697).] Timothy has past relevant work history as a warehouse worker. [Dkt. 8-13 at 20 (680).]

#### B. ALJ Decision

In determining whether Timothy qualified for benefits under the Act, the ALJ went through the five-step analysis required by 20 C.F.R. § 404.1520(a). At step one, the ALJ found that Timothy was insured through June 30, 2014 and had not been engaged in substantial gainful activity since his alleged onset date of disability. [Dkt. 8-13 at 7 (R. 667).]  At step two, the ALJ found that Timothy's severe impairments included "obesity; degenerative disc disease of the thoracic and

lumbar spine; depressive disorder; anxiety disorder; borderline intellectual functioning; and a personality disorder. [*Id.*]

At step three, the ALJ considered Timothy's spinal disorder under Listing 1.04; his obesity under Listings 1.00Q, 3.00I, and 4.00F; and his mental health impairments under Listings 12.04, 12.06, 12.08, and 12.11. The ALJ determined that Timothy did not meet or medically equal any listing. [Dkt. 8-13 at 8-10 (R. 668-70.] Next, the ALJ determined Timothy had a residual functional capacity ("RFC") to perform a limited range of light work, with the following requirements: lifting, carrying, pushing, and pulling 20 pounds occasionally and 10 pounds frequently; could sit for 6 hours of the work day and stand/walk for 6 hours of the work day; occasionally climb ramps and stairs, balance, stoop, kneel, and crouch, but he could not crawl or climb ladders, ropes, or scaffolds; occasionally could reach overhead bilaterally and was unimpaired in reaching in other directions; could not work at unprotected heights, around dangerous, moving machinery, or on wet, slippery, uneven surfaces; could not tolerate more than occasional exposure to industrial vibrations. [Dkt. 8-13 at 10 (R. 670).]

As to mental limitations, the ALJ determined that Timothy "could understand, remember, and carry out short simple, repetitive instructions. He could sustain attention/concentration for 2 hour periods at a time and for 8 hours in the work day on short, simple, repetitive tasks. [He] could persist and/or maintain pace for 2 hours at a time and for 8 hours in order to complete the above tasks. He could use judgment in making work-related decisions commensurate with the type of

work above. He required an occupation with set routine and procedures, and few changes in the workday. He required an occupation with only occasional coworker contact and supervision, and no contact with the public." [*Id*.]

The ALJ determined, at step four, that Timothy could not perform his past work as a warehouse worker because it required heavy exertion. [Dkt. 8-13 at 19-20 (R. 679-80).] At step five, the ALJ determined that, considering his age, education, work experience, and RFC, Timothy could perform the jobs of merchandise marker, routing clerk, and collator operator. [Dkt. 8-13 at 20-21 (R. 680-81).] Accordingly, the ALJ concluded that Timothy was not disabled under the Act.

### C. Medical History[2]

On June 6, 2008, Timothy presented to Dr. Seth Banks, his primary care physician, with complaints of anxiety and stress related to losing his job. [Dkt. 8-9 at 32 (R. 434).] Dr. Banks noted that Timothy had neurotic excoriations, or self-inflicting scratching as a result of an emotional problem. [*Id*.]

On February 11, 2010, Timothy returned to Dr. Banks complaining of stress, forgetfulness, and anxiety due to his job situation. [Dkt. 8-9 at 22 (R. 424).] Dr. Banks recommended compliance with a short-term prescription for Clonazepam.[3] [*Id* at 21 (R. 423).] On March 8, 2010, Dr. Banks submitted a referral to a

---

[2] The Plaintiff's arguments focus solely on the ALJ's treatment of his mental impairments and the medical opinions in the record that discuss those impairments. Accordingly, the Court will only include in the medical history portion the history related to Plaintiff's mental impairments.

[3] Clonazepam is a benzodiazepine medication that is used to treat certain types of anxiety disorders. *Clonazepam*, https://www.drugs.com/clonazepam.html (last visited September 20, 2019).

neurologist to address Timothy's continued issues with decreased strength, stress, and forgetfulness. [Dkt. 8-9 at 56 (R. 458).]

On March 17, 2010, Timothy presented to Dr. Theodore Nukes for a neurological consultation. [Dkt. 8-9 at 50 (R. 452).] Timothy complained of memory loss, increased stress from being out of work, and poor sleep. [*Id.*] Dr. Nukes diagnosed Timothy with memory loss, most likely secondary to anxiety or depression and an unusual personality style. [*Id* at 51 (R. 453).] Dr. Nukes referred him for a serologic workup and an MRI of the brain, and recommended that he undergo neuropsychological testing. [*Id* at 52 (R. 454).]

An MRI of the brain conducted on March 30, 2010 showed "numerous punctate subcortical white matter hyperintensities" that "may be related to migraine, other causes of chronic small vessel ischemic disease, demyelination or prior inflammation." [Dkt. 8-9 at 54 (R. 456).]

On April 8, 2010, Timothy presented to Dr. Robert Blake, a clinical psychologist, for a mental status examination at the request of the SSA. [Dkt. 8-10 at 2 (R. 487).] He reported that he was the main caretaker for an autistic son, was increasingly forgetful, and had difficulty with sleep. [*Id* at 2-3 (R. 487-88).] Dr. Blake observed that Timothy focused well for two hours and had no significant issues with concentration, memory, general knowledge, or judgment. [*Id* at 3-5 (R. 488-90).] Dr. Blake concluded that Timothy had moderate problems with mental math calculations and abstracting ability and that his ability to work would be moderately affected by his severe visual processing and memory limitations. [*Id* at 4

8

(R. 490).] Timothy was diagnosed with moderate amnestic disorder, nonspecific, with a severe visual processing and memory problem. [*Id.*]

On April 12, 2010, state agency physician Dr. Ken Lovko completed a Psychiatric Review Technique and Mental Residual Functional Capacity Assessment [Dkt. 8-10 at 10-27 (R. 495-512).] Dr. Lovko indicated that Timothy had a memory impairment and moderate amnestic disorder, which resulted in mild difficulties in activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. [*Id.*] Dr. Lovko further indicated that Timothy was moderately limited in his ability to understand and remember detailed instructions and in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, but that he was not otherwise significantly limited. [*Id.*] In the narrative section, Dr. Lovko stated that although Timothy has a diagnosis of moderate amnestic disorder, his daily functioning presents as more capable than would be expected and that his performance on memory tasks overall was quite good. [*Id* at 26 (R. 511).] Dr. Lovko further noted that Timothy could attend to task for sufficient periods of time to complete tasks and that he could manage the stresses involved with simple work. [*Id.*]

Timothy returned to Dr. Nukes on April 19, 2010, who indicated that the serologic work-up was negative. [Dkt. 8-9 at 69 (R. 471).] Dr. Nukes wondered how much of Timothy's symptoms were premorbid, or occurring prior to his depression

and anxiety diagnoses. [*Id* at 70 (R. 472).] Dr. Nukes did not want to prescribe any medications due to his uncertainty of Timothy's diagnosis; instead, Dr. Nukes performed cognitive testing and recommended that Timothy undergo a repeat neuropsychological evaluation in six months. [*Id*.] Timothy scored 17/80 on the cognitive testing, with a score of 0 being the best, but Dr. Nukes noted that Timothy did not seem to try and apply full effort to the memory tasks. [*Id* at 72 (R. 474.]

On November 3, 2010, Timothy was evaluated by Dr. Banks for his complaints of depression due to his continued pain. [Dkt. 8-10 at 86-87 (R. 571-72).] Timothy reported that his disability application was denied and that he was attempting to go through the appeals process. For his depression, Timothy was prescribed Cymbalta. [*Id*.] At his follow-up visit on December 1, 2010, Timothy noted that the Cymbalta prescription had caused significant difficulty with information processing and memory function and that he had discontinued taking the prescription due to the side effects. [Dkt. 8-10 at 84 (R. 569).] Timothy was prescribed Lexapro. [*Id* at 83 (R. 568).] On December 15, 2010, Timothy reported to Dr. Banks that the Lexapro had caused tinnitus, tiredness, forgetfulness, and anxiety. [Dkt. 8-10 at 81 (R. 566).] Dr. Banks discontinued the Lexapro prescription and instead prescribed Wellbutrin. [*Id* at 80 (R. 565).]

At follow-ups with Dr. Banks on December 30, 2010, January 13, 2011, February 24, 2011, and April 7, 2011, Timothy reported that the Wellbutrin prescription was making a noticeable difference and helping to manage his depression. [Dkt. 8-10 at 70-78 (R. 555-563).]

10

On June 7, 2011 and July 5, 2011, Timothy returned to Dr. Banks for complaints of anxiety and depression. Dr. Banks noted that Timothy still had neurotic excoriations and recommended that Timothy continue taking Wellbutrin. [Dkt. 8-10 at 64-65, 67-68 (R. 549-50, 652-53).]

On August 25, 2011, Dr. Banks drafted a medical source statement indicating that Timothy had moderate to severe limitations in performing activities like sitting, standing, walking, lifting, carrying, and handling objects, and recommended that Timothy undergo a functional capacity exam to quantify the extent of his limitations. [Dkt. 8-10 at 93 (R. 578).] As to Timothy's mental condition, Dr. Banks noted that he had been diagnosed with amnestic disorder and had moderate to severe problems with visual processing and memory during his neuropsychological examination. [*Id*.]

On March 21, 2013, consultative examiner and clinical psychologist Dr. Steven Herman evaluated Timothy at the request of the SSA. [Dkt. 8-10 at 96 (R. 581).] Dr. Herman noted that Timothy was an extremely poor historian, unless he was asked about his pain, the accident that caused it, or his functional abilities. [*Id*.] Timothy was unable to interpret any of the proverbs administered, was unable to correctly recall recent presidents, and was unable to perform any addition, subtraction, multiplication or division (indicating that 1+2=10). [*Id* at 97 (R. 582).]. [*Id*.] Dr. Herman stated that Timothy's responses were bizarre and indicated that Timothy began the evaluation excessively polite and apologetic, but became increasingly sarcastic, negativistic and irritable as the session progress. [*Id* at 98

(R. 583).] Dr. Herman concluded: [d]ue to the claimant's poor effort, the strong indication of a malingering response set, and the numerous inconsistencies in his presentation and report, the results of this evaluation are of questionable validity. Very few conclusions can be drawn with any sort of confidence other than that he appeared to be purposefully attempting to present himself as far more impaired (and unrealistically so) than he truly is." [Dkt. 8-10 at 99 (R. 584).] Dr. Herman did not fill out the Medical Source Statement of Ability To Do Work-Related Activities (Mental) because "these questions cannot accurately be answered at this time." [*Id* at 100 (R. 585).]

On April 6, 2013, Dr. Mauro Agnelneri, consultative examiner and internist, evaluated Timothy at the request of the SSA. [Dkt. 8-11 at 3 (R. 589).] Dr. Agnelneri noted that Timothy followed simple and complex directions and commands without difficulty and that his memory of recent and remote medical events was spotty. [*Id* at 4 (R. 590).] As to Timothy's mental health problems, Dr. Agnelneri stated that Timothy was taking no medication and not seeing a therapist, but that he was having significant stress over his job which had ended five years earlier. [*Id* at 6 (R. 592).] Dr. Agnelneri concluded by stating: "[o]f significant note of the patient's disability for just three years ago his range of motion was virtually normal now he can barely do anything for himself. His story is not reasonable." [*Id.*]

On August 26, 2013, Dr. Caryn Vogel, neurologist, evaluated Timothy for his complaints of dizziness, numbness and tingling, fatigue, and cognitive difficulties. [Dkt. 8-21 at 38 (R. 1181).] Dr. Vogel noted that Timothy's attention, concentration,

problem solving, and short-term memory were impairments, for which she referred him for a brain MRI. [*Id* at 40 (R. 1183).] An MRI of the brain performed on August 31, 2013 revealed a stable appearance of the white matter foci predominantly within the subcortical white matter. [Dkt. 8-21 at 57 (R. 1200.]

On September 16, 2013, Timothy presented to his neurologist, Dr. Vogel, for a recheck of cognitive difficulties. Timothy and his wife stated that he had symptoms of cognitive impairment, attention deficit, impaired concentration, difficulty speaking, and impaired comprehension. [Dkt. 8-11 at 45 (R. 631); 8-12 at 29 (R. 659).] Timothy was referred for a home sleep test; an EMG; neuropsychological testing; and various laboratory tests. [Dkt. 8-12 at 30 (R. 660).] On April 3, 2014, Timothy was evaluated by Dr. Vogel, who diagnosed him with a cognitive impairment. [Dkt. 8-21 at 29-30 (R. 1172-73).] Dr. Vogel noted that Timothy refuted the results of his previous neuropsychological test. [*Id*.]

Dr. Vogel evaluated Timothy in a follow-up on June 2, 2014. [Dkt. 8-21 at 24 (R. 1167).] Dr. Vogel reviewed the results of Timothy's previous neuropsychological testing with Dr. Herman that suggested the results were invalid and possibly represented malingering or a psychological impairment but no significant cognitive impairment. [*Id*.] Dr. Vogel noted that Timothy's medication had helped his mood, but it had not improved his cognitive difficulties and he did not want to undergo a PET scan. [*Id* at 26 (R. 1169).]

At a follow-up with Dr. Vogel on June 15, 2015, Timothy reported continue cognitive difficulties. [Dkt. 8-12 at 20 (R. 650).] Timothy and his wife noted that

recent significant stress may be contributing to his worsening mood, but that he refused a follow up neuropsychology study or PET scan to address his cognitive impairment. [*Id* at 21 (R. 651).] On September 21, 2015, Timothy returned to Dr. Vogel for a follow-up. [Dkt. 8-12 at 16 (R. 646).] Dr. Vogel noted that Timothy refused another neuropsychology study or a PET scan to address his cognitive decline and referred him to psychiatry for his depression. [*Id* at 17 (R. 647).]

Between October 27, 2015 and March 7, 2016, Dr. Nirav Bigelow, a clinical psychologist, evaluated Timothy in consultation at the request of Dr. Vogel. [Dkt. 8-12 at 2 (R. 632).] Timothy informed Dr. Bigelow that his disability application was denied and in the appeals process, but that this evaluation was not initiated because of his disability application. [*Id*.] Timothy reported that his memory had declined, that he easily gets confused and makes careless mistakes, that he struggles to follow directions, that he has difficulty understanding people and often gets frustrated, and that his wife has to remind him to complete tasks. [*Id* at 4 (R. 634).] Dr. Bigelow noted that Timothy talked excessively, blurted out answers before questions were completed, had difficult taking turns, interrupted others, and got easily frustrated. [*Id*.] Dr. Bigelow noted that Timothy appeared to be exaggerating symptoms during several subtests and those subtests had to be administered three different times due to fluctuations in his responses to simple questions. [*Id* at 6 (R. 636).] Timothy completed an inventory to detect the presence of malingering, which resulted in a score far above the recommended cutoff score for the identification of suspected malingering. [*Id* at 10 (R. 640).] Dr. Bigelow

cautioned that the results of several tests should be interpreted with caution due to Timothy's tendency toward exaggeration. [*Id* at 9-10 (R. 639-40).] Dr. Bigelow diagnosed Timothy with a mild intellectual disability, major depressive disorder with psychotic features, and an unspecified anxiety disorder. [*Id* at 12 (R. 642).]

On April 11, 2016, Timothy returned to Dr. Vogel for evaluation of his cognitive difficulties. [Dkt. 8-21 at 15 (R. 1158).] Dr. Vogel noted that Timothy and his wife were very frustrated with the results of the neuropsychology study that suggested malingering and psychiatric disease contributed to the poor results. [*Id*.] Timothy was adamant that he was not malingering but refused further treatment. [*Id*.] On February 13, 2017, Dr. Vogel reevaluated Timothy for his complaints of cognitive decline. [Dkt. 8-21 at 8 (R. 1151).] Dr. Vogel noted that Timothy disputes the results of his neuropsychological study with Dr. Bigelow and refuses any further testing for his cognitive difficulties. [*Id* at 9 (R. 1152).]

On August 11, 2017, Timothy began a course of conversation therapy through St. Vincent. [Dkt. 8-23 at 3-21 (R. 1263-281).] A social worker met with Timothy once per week until September 22, 2017 to address his issues of stress and anxiety related to home repairs, grief and loss, and pain. [*Id*.]

On March 22, 2018, Timothy returned to Dr. Vogel for a follow-up related to his cognitive difficulties. [Dkt. 8-22 at 41 (R. 1259).] Timothy and his wife reported that he continued to experience a cognitive decline since his last visit. [*Id*.] Dr. Vogel again discussed the results of his last neuropsychology study with Dr. Bigelow, which had shown mild intellectual dysfunction, an exaggeration of

symptoms with possible malingering, depression, and anxiety. [*Id* at 42 (R. 1260).] Dr. Vogel noted that Timothy and his wife vehemently disagreed with the results of the neuropsychological evaluation and that he refused to participate in another study or further work-up. [*Id.*]

## IV.   Analysis

Timothy asserts that substantial evidence fails to support the ALJ's determination that he was not disabled, but makes two general arguments: 1) that the ALJ failed to consider the medical opinions of Dr. James Brooks, Dr. Robert Blake, and Dr. Seth Banks; and 2) that the ALJ failed to adequately account for his limitations in concentration, persistence, and pace in the RFC analysis and in the hypotheticals provided to the vocational expert. The Court will address each challenge in turn.

### A.  Weighing of Medical Opinions

Timothy argues that the ALJ improperly evaluated and weighed the medical opinions in the record, but focuses specifically on three medical opinions: testifying medical expert, Dr. James Brooks; consultative examiner, Dr. Robert Blake; and treating physician, Dr. Seth Banks.

#### i.  *Medical Expert – Dr. James Brooks*

When the case was remanded by this Court in 2017, the Appeals Council determined that a new ALJ should conduct further proceedings. [Dkt. 8-15 at 34 (R. 875).] That new ALJ, Blanca de la Torre, conducted a hearing in May 2018, where medical expert Dr. James Brooks testified. Dr. Brooks reviewed the entirety of the

medical records and listened to Timothy's testimony during the hearing. [Dkt. 8-13 at 59 (R. 719).] Timothy argues that the ALJ improperly relied on the testimony and conclusions of Dr. Brooks, which led to an inaccurate residual functional capacity assessment.

The Commissioner argues that the ALJ properly relied on Dr. Brooks's medical opinion. Moreover, the Commissioner asserts that it was disingenuous for the Plaintiff to conclude that Dr. Brooks's equivocating statement that his conclusions could be wrong indicates that he's an unreliable expert, and that, in turn, the Court should not credit the inaccurate assertions in Plaintiff's brief. [Dkt. 18 at 16-17.]

In his reply brief, Timothy reasserts that it was improper for the ALJ to rely on the opinion of Dr. Brooks, who never examined the claimant, instead of the consultative state agency physicians, Dr. Blake, Dr. Herman, and Dr. Agnelneri, who did examine him. In sum, Timothy argues that Dr. Brooks did not adequately assess the medical evidence and instead improperly concluded that Timothy was malingering, without appropriate explanation and, therefore, that it was error for the ALJ to rely on such an opinion.

In her opinion, the ALJ discussed Dr. Brooks's medical opinion at length:

> I am in general agreement with Dr. Brooks (sic) assessment of the claimant's cognitive function. Dr. Brooks provided a careful review of the file and more than satisfactory rationale in support of his opinion. He explained discrepancies in the record and he identified flaws pertaining to other relevant medical opinions. Dr. Brooks has program knowledge and he offered an impartial assessment. However, I have limited the claimant to simple, repetitive tasks. In doing so, I have considered other

impairments that may not affect cognition as much but would affect performance, for example, depression, anxiety, and personality disorder. Thus, my RFC determination is more restrictive than the RFC proposed by Dr. Brooks. The more restrictive RFC also factors in the claimant's subjective symptoms of memory loss, diminished comprehension and occasional disorientation. . . . I afford great weight to Dr. Brooks's opinion because he reviewed a complete record, he heard the claimant's testimony, and he provided an impartial opinion. He also addressed the flaws in other opinions. Dr. Brooks's opinion regarding functional limitations was not specifically adopted because, as already noted, I considered other impairments and the claimant's subjective complaints. I am persuaded that he is better suited for simple, repetitive and routine tasks within the parameters set forth above. I also find that the evidence outside the claimant's date last insured is relevant in the evaluation process because it allows for a whole picture analysis.

[Dkt. 8-13 at 12, 18 (R. 672, 678).]

Weighing conflicting evidence from medical experts is what ALJs are required to do. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) (ALJ discounted an examining physician's opinion that was contradicted by several other examining and non-examining physicians' opinions). 20 C.F.R. 404.1527(c)(1) states that generally ALJs "give more weight to the medical opinion of a source who has examined [a claimant] than to the medical opinion of a medical source who has not examined [a claimant]." 20 C.F.R. 404.1527(c)(1). If the ALJ determines that no medical opinion in the record deserves controlling weight, as happened in this case, the ALJ must consider every opinion in the record according to the relevant regulatory factors, which include whether the physician: examined the claimant; treated the claimant frequently or for an extended period of time; specialized in treating the claimant's condition; performed appropriate diagnostic tests; or offered

18

opinions consistent with the objective medical evidence and the record as a whole. 20 C.F.R. 404.1527(c).

The ALJ considered every medical opinion in the record and decided to give no opinion controlling, or even significant, weight. She ultimately gave great weight to Dr. Brooks because he had the benefit of reviewing the entire medical record, heard the claimant's testimony at the 2018 hearing, and provided an impartial opinion. Of the regulatory factors, the ALJ considered Dr. Brooks's specialty, clinical psychology, which would place him in the same category as consultative examiners Dr. Blake and Dr. Herman. [Dkt. 8-10 at 2, 99 (R. 487, 584).] She also considered whether Dr. Brooks's medical opinion was consistent with and supported by the objective medical evidence and the record as a whole, noting that Dr. Brooks was able to explain various discrepancies in the record and that at the hearing he identified flaws in other relevant medical opinions. The ALJ considered the RFC that Dr. Brooks recommended – that Timothy could understand, remember, and carry out short simple, repetitive instructions, sustain attention and concentration for 2 hour periods at a time and for 8 hours in the work day, persist or maintain pace for 2 hours at a time and for 8 hours in order to complete the above tasks, use judgment in making work-related decisions commensurate with the type of work above, required an occupation with set routine and procedures, and few changes in the workday, required an occupation with only occasional coworker contact and supervision, and no contact with the public – and concluded that Timothy's impairments warranted a more restrictive RFC.

The Plaintiff argues that the ALJ's reliance on the flawed testimony and conclusions of Dr. Brooks caused the ALJ to formulate an inaccurate RFC for Timothy. The Plaintiff's most charged argument asserts that the ALJ made the same mistake as the previous ALJ and improperly characterized Timothy as a malingerer. [Dkt. 14 at 20.] The Plaintiff argues that this Court previously rejected the characterization of the Plaintiff as a malingerer, but a review of the opinion demonstrates otherwise. [Dkt. 8-15 at 22 (R. 863).] This Court actually concluded in the previous decision that the ALJ did not accurately assess the various medical opinions or conduct a proper credibility analysis; the Court did not make a fact conclusion as to whether Timothy was or was not a malingerer. [*Id*.] Instead, the Court ordered the case to be remanded back to the agency for further proceedings so that the ALJ could reweigh the medical opinions and conduct a proper credibility analysis of the Plaintiff. [*Id*.]

Unlike in the previous opinion, here, the ALJ exhaustively recited the medical evidence, included an explanation for distinguishing between the medical opinions that determined Timothy's malingering was the result of a mental impairment and those that determined the malingering was the mere result of exaggeration and poor effort, and provided Dr. Brooks's independent medical opinion. The ALJ further noted that Dr. Brooks had the benefit of reviewing every record in Timothy's medical history. [Dkt. 8-13 at 11 (R. 671).] Those medical records demonstrate consistent support for Dr. Brooks's opinion: Dr. Blake noted no issues with concentration, memory, general knowledge, or judgment in April 2010.

20

[Dkt. 8-10 at 305 (R. 488-90).] Dr. Nukes stated that Timothy did not seem to try or apply full effort to memory tasks in April 2010. [Dkt. 8-9 at 72 (R. 474).] Dr. Herman noted that Timothy's answers were bizarre, he put forth poor effort, and assigned a primary diagnosis of malingering in March 2013. [Dkt. 8-10 at 98-99 (R. 583-84).] Dr. Agnelneri concluded that Timothy's story related to his subjective complaints of pain was not reasonable in April 2013. [Dkt. 8-11 at 6 (R. 592).] Dr. Bigelow noted that Timothy exaggerated his symptoms and was possibly malingering in March 2016. [Dkt. 8-12 at 6, 9-10 (R. 636, 639-40).] Accordingly, Dr. Brooks's medical opinion was consistent with the remainder of the medical evidence in the record.

Additionally, Timothy notes that Dr. Brooks acknowledged at the 2018 hearing that another impartial reviewing expert may come to a different conclusion based on the evidence. Thus, Timothy argues, Dr. Brooks's opinion is unreliable because he concedes fallibility. [Dkt. 14 at 21.] It was not unreasonable or disqualifying for Dr. Brooks to recognize that there are other possible medical diagnoses. Instead, it was reasonable for Dr. Brooks, based on the totality of the evidence in front of him, to make his own medical conclusions about Timothy's mental limitations, and for the ALJ in turn to rely on those conclusions in accordance with the 20 C.F.R. 404.1527 regulatory factors and in relation to the medical evidence and testimony. Accordingly, the Court determines that the ALJ's decision to rely on Dr. Brooks's medical opinion and assign it great weight was supported by substantial evidence.

*ii. Consultative Examiner – Dr. Robert Blake*

Timothy argues that the ALJ here made the same mistake as the ALJ in 2014 by misstating and misrepresenting Dr. Blake's medical findings, which lead to an improper discounting of his medical opinion.  The Commissioner argues that the ALJ's decision to give partial weight to Dr. Blake's medical opinion was proper because the opinion conflicted with the findings of other medical providers.

On April 8, 2010, Timothy presented to Dr. Blake for a mental status examination at the request of the SSA. Dr. Blake evaluated Timothy using various mental, visual, spatial, and verbal tests and diagnosed him with moderate amnestic disorder with a severe visual processing and memory problem, along with mild to moderate stress from being unable to find or be accepted for a job. [Dkt. 8-10 at 2-5 (R. 487-490).] Dr. Blake performed a memory test called the Wechsler Memory Scale-IV, and determined that Timothy's memory testing fell into the extremely low classification, in large part due to his difficulty in analyzing, processing, and trying to remember visual information. [Dkt. 8-10 at 7 (R. 492).] Dr. Blake noted:

> Of interest is that on the Spatial Additional sub-test he never understood the instructions even though they were explained to him multiple times, many more times than the test protocol calls for. Within his own logic, he may have performed significantly higher on this sub-test since he showed a consistent (wrong) set of answers. But the fact that he could not understand the instructions after multiple presentations suggests that his extremely low score on this item is generally indicative of the level of his problem, even though it may not all have to do with visual/spatial memory. These test findings represent significant memory and concentration problems of a moderate level overall and a severe level in visual processing and memory.

[*Id.*] In the 2014 ALJ opinion, the ALJ noted that "[t]he claimant's memory test scores were low, but Dr. Blake believed the results invalid because of the failure to follow examination instructions." [Dkt. 8-2 at 41 (R. 40).] The 2014 ALJ gave little weight to Dr. Blake's opinion because "Dr. Blake noted the claimant's testing appeared to be compromised by his lack of understanding of the test directions. Furthermore, the opinion is at odds with the claimant being involving in amateur radio and caring for a disabled child." [Dkt. 8-2 at 42 (R. 41).]

Chief Judge Magnus-Stinson previously determined that the ALJ's two listed reasons were not sufficient for rejecting Dr. Blake's opinion, with the former reason being inadequate because Dr. Blake pointed out that Timothy was consistent with his wrong answers, which seemed to demonstrate that his extremely low score was indicative of the level of his problem. [Dkt. 8-15 at 15 (R. 856).] The Court further noted that the ALJ should have given adequate reasons for discounting the opinion. [Dkt. 8-15 at 16 (R. 857).]

On remand, ALJ de la Torre evaluated Dr. Blake's medical opinion and, in her June 29, 2018 opinion, noted that "Dr. Blake questioned the reliability of results based on the claimant's failure to follow examination instructions. Further, [Dr. Blake] suspected the results were not an accurate reflection of the claimant's memory functioning." [Dkt. 8-13 at 13 (R. 673).]

Plaintiff argues that the ALJ inaccurately considered and weighed Dr. Blake's medical opinion. Specifically, he argues that the ALJ mischaracterized Dr. Blake's interpretations of the results of Timothy's memory test by attributing the

results to Timothy's lack of understanding of the test instructions, whereas Dr. Blake attributed the results to Timothy's psychological impairment. He further argues that the ALJ's "characterization of Dr. Blake's assessment of Plaintiff's limitations as unreliable due to Plaintiff's difficulty understanding instructions of one sub-test fails, once again, to provide the logical and accurate explanation for her dismissal of the opinion." [Dkt. 14 at 16.]

The Commissioner responds that the ALJ gave partial weight to Dr. Blake's opinion because the ALJ properly deferred to Dr. Brooks, the medical expert who testified at the 2018 hearing, and because Dr. Blake's opinion conflicts with the findings of the other medical providers who questioned Plaintiff's testing results due to malingering or lack of effort. [Dkt. 18 at 10-11.]

The Plaintiff asserts in his reply that the Commissioner labels Timothy a malingerer, even though the majority of the medical providers concluded that Timothy's behavior was due to an underlying psychological impairment or personality disorder. Plaintiff argues that it was inappropriate for the ALJ to rely on the opinion of non-examining medical expert, Dr. Brooks.

First, the Court does take notice of the fact that the ALJ once again misstated Dr. Blake's finding regarding Timothy's misunderstanding of the test instructions and incorrectly mentioned that Dr. Blake questioned the reliability of the test results on that basis. Dr. Blake concluded that Timothy's difficulty understanding the test instructions was due to the severity of Timothy's psychological impairment and did not indicate any suspicion that the rest results

24

were invalidated. The ALJ's misrepresentation here, especially in light of the

Court's 2017 order that expressly rejected that inaccurate assessment, is troubling.

But, because the ALJ did not discount Dr. Blake's medical opinion solely because of

a misrepresentation as to the effect of Timothy's instruction misunderstanding, and

instead justified her decision using the appropriate regulatory factors, that error is

not dispositive.

In *Gudgel v. Barnhart*, the Seventh Circuit held that "[a]n ALJ can reject an

examining physician's opinion only for reasons supported by substantial evidence in

the record; a contradictory opinion of a non-examining physician does not, by itself,

suffice." 345 F.3d 467, 470 (7th Cir. 2003).

Here, the ALJ offered this conclusion with regard to Dr. Blake's opinion:

> Dr. Blake opined that the claimant had moderate problems with
> mental math calculations and abstracting ability. I afford this
> opinion weight because it is consistent with his clinical findings.
> He has experience interpreting test results and evaluating
> mental health patients. However, [Dr. Blake] had limited scope of
> the record and he failed to adequately consider the claimant's
> malingering presentation in his assessment for 'extremely low
> memory testing.' Dr. Blake was described as a neuropsychologist,
> but this is incorrect. Dr. Brooks know[s] Dr. Blake and clarified
> that he is a clinical psychologist, like him."

[Dkt. 8-13 at 18 (R. 678).] The ALJ considered Dr. Blake's specialty, whether Dr.

Blake examined Timothy and performed appropriate diagnostic tests, and the

consistency and supportability with the record. The ALJ considered the fact that Dr.

Blake is a clinical psychologist, placing him in the same category as testifying

medical expert Dr. Brooks and consultative examiner Dr. Herman. She considered

that Dr. Blake performed appropriate medical testing, such as the various mental,

visual, spatial, and verbal tests, in order to come to his conclusion that Timothy suffered from moderate amnestic disorder. Finally, the ALJ considered that Dr. Blake's medical opinion was one of the earliest in the record and that a good percentage of the medical evidence that came after Dr. Blake's opinion, such as from Dr. Brooks and Dr. Herman, demonstrated a propensity for poor effort, exaggeration, and malingering. Dr. Blake concluded that Timothy had severe mental limitations, but Dr. Brooks and Dr. Herman concluded that it was impossible to determine Timothy's mental limitations due to his poor effort and malingering. Moreover, the ALJ relied on Dr. Brooks's medical opinion that Dr. Blake's conclusions were invalidated due to possible malingering, given that the results were similar to his performance on other mental consultative evaluations. [Dkt. 8-13 at 61-62, 65 (R. 721-22, 25).] *See Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) (the Court may not reweigh the evidence or decide questions of credibility or, in general, substitute its own judgment for that of the Commissioner).

Accordingly, because the ALJ considered Dr. Blake's medical opinion in accordance with the 20 C.F.R. 404.1527 regulatory factors and in light of the other medical evidence and testimony, and provided good reasons for discounting his opinion, the Court concludes that the ALJ's decision to discount Dr. Blake's medical opinion was supported by substantial evidence.

### iii. *Treating Physician – Dr. Seth Banks*

The Plaintiff next argues that the ALJ did not properly evaluate Dr. Seth Banks's opinion and failed to articulate any "good reasons" for discounting said

opinion. [Dkt. 14 at 17.] Timothy argues that as his treating physician, Dr. Banks was entitled to controlling weight unless the ALJ could identify good reasons for discounting the opinion.

The Defendant asserts that the ALJ properly discounted Dr. Banks's medical opinion as it related to Timothy's mental status because Dr. Banks merely recited the diagnoses and conclusions of Dr. Blake and did not submit any diagnoses or conclusions himself. [Dkt. 18 at 11-12.] The Commissioner further argues that because medical opinions are statements "that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite impairment(s), and [his] physical or mental restrictions, [20 C.F.R. § 404.1527(a),] Dr. Banks's medical source statement does not qualify as a medical opinion and, thus, the ALJ was not required to rely on it. [*Id.*]

The Plaintiff argues in reply that the ALJ specifically called Dr. Banks's submission a medical source statement and that it is inappropriate and in violation of the *Chenery Doctrine* for the Commissioner to supply further rationale than the ALJ herself provided. [Dkt. 20 at 5.] Finally, the Plaintiff argues that if the ALJ was confused about whether Dr. Banks was endorsing Dr. Blake's medical opinion or whether he was just reciting Dr. Blake's conclusions, the ALJ should have recontacted Dr. Banks for clarification.

Here, Dr. Banks provided a medical source statement as follows:

I have been asked to write a statement regarding my patient Timothy [identifying info omitted]. His ability to do work related

physical activities such as sitting, standing, walking, lifting, carrying, and handling objects are all moderate to severely limited secondary to pain in his hips and knees. I would recommend a dedicated functional capacity exam to quantify the true limits of his physical capabilities.

I have also been asked to comment on his mental condition. He has been through a battery of neuropsychiatric testing. He was determined to be incapable of managing his own money due to issues with calculation. Additionally, he was diagnosed with amnestic disorder by the neuropsychiatrist, who stated that his memory overall falls into the extremely low classification. He was found to have memory and concentration problems of a moderate level overall with severe problems with visual processing and memory.

[Dkt. 8-10 at 93 (R. 578).] The ALJ discounted Dr. Banks's medical source statement based on the following explanation:

I find his opinion overstated and inconsistent with the evidence as a whole. Dr. Banks indicated the claimant's pain had a moderate to severe impact on his ability to sit, stand, walk, lift, carry and handle objects; however, his treatment notes reflect relatively benign findings; they essentially document the claimant's subjective complaints. Dr. Banks does not specifically record clinical findings that would erode occupations at the light unskilled level. He prescribes the claimant medical for pain and other symptoms, but he fails to provide adequate explanation in support of his opinion. He recommended a functional capacity evaluation to quantify the true limits of [Timothy's] physical capabilities. Dr. Banks repeated the consultative examiner's findings regarding the claimant's mental status. He did not directly indicate specific functional limitations related to memory or cognitive difficulties, and the evidence developed subsequent to his letter further reflects an exaggeration of symptoms.

[Dkt. 8-13 at 19 (R. 679).]

In determining whether the ALJ properly discounted the opinion of Timothy's treating physician, the Court must first determine whether the "treating physician" rule applies. Based on the filing date of Timothy's application, the treating

28

physician rule does apply. *Gerstner v. Berryhill*, 879 F.3d 257, 261 (7th Cir. 2018) (noting that the treating physician rule applies only to claims filed before March 27, 2017). In *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011) (quoting 20 C.F.R. § 404.1527(c)(2)6), the Seventh Circuit held that a "treating doctor's opinion receives controlling weight if it is 'well-supported' and 'not inconsistent with the other substantial evidence' in the record." *See Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011); *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010). "An ALJ must offer 'good reasons' for discounting the opinion of a treating physician." *Scott*, 647 F.3d at 739 (citing *Martinez v. Astrue*, 630 F.3d 693, 698 (7th Cir. 2011); *Campbell*, 627 F.3d at 306).

"If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Scott*, 647 F.3d at 740 (citing *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009)); *see* 20 C.F.R. § 416.927(c). However, so long as the ALJ "minimally articulates" her reasoning for discounting a treating source opinion, the Court must uphold the determination. *See Elder v. Astrue*, 529 F.3d 408, 415-16 (7th Cir. 2008) (affirming denial of benefits where ALJ discussed only two of the relevant factors laid out in 20 C.F.R. § 404.1527).

As an initial matter, the Court does not accept the Commissioner's argument that Dr. Banks's statement does not qualify as a medical opinion. The ALJ

concluded that the statement qualifies as a medical opinion and evaluated it as such, and the Court will not accept a different post hoc rationalization than provided by the ALJ.

With regard to the 20 C.F.R. § 1527 regulatory factors, the ALJ appears to consider Dr. Banks's specialty, his treating relationship with Timothy, and the consistency and supportability of his opinion with the remaining evidence in the record. She notes that Dr. Banks is Timothy's primary care physician. [Dkt. 8-13 at 12 (R. 672).] She further discusses the consistency and supportability of Dr. Banks's opinion with the record. As to the physical findings, the ALJ indicates that Dr. Banks mostly listed Timothy's subjective complaints and that his treatment notes do not demonstrate any clinical findings that would preclude Timothy from working at the light unskilled level. An ALJ can discount medical opinions based on subjective reports and even reject a doctor's opinion entirely if it appears based on a claimant's exaggerated subjective allegations. *Britt v. Berryhill*, 889 F.3d 422, 426 (7th Cir. 2018).

As to the mental limitations, she states that Dr. Banks merely recited the consultative examiner's findings, rather than assigning his own diagnoses or functional limitations. The Plaintiff urges the Court to consider Dr. Banks's medical opinion as corroborating Dr. Blake's evaluation and diagnoses; but a plain reading of Dr. Banks's statement forces the opposite conclusion. Dr. Banks uses language such as "he was determined to be" and "he was found to have" and "he was diagnosed with." Dr. Banks does not use language that suggests he concurs with

any of the listed findings, nor does he include any independent judgment about Timothy's condition or limitations. Accordingly, the Court cannot say that it was improper for the ALJ to conclude that Dr. Banks's medical source statement merely copied the medical findings from Dr. Blake.

The ALJ discussed at least two of the 20 C.F.R. 404 15.127 regulatory factors in evaluating Dr. Banks's medical opinion as Timothy's treating physician. Her discussion, while undoubtedly minimal, satisfies the minimal articulation test. *See Elder v. Astrue*, 529 F.3d 408, 415-16 (7th Cir. 2008) (affirming denial of benefits where ALJ discussed only two of the relevant factors laid out in 20 C.F.R. § 404.1527).

Additionally, when considering whether the ALJ should have recontacted Dr. Banks for clarification, the Plaintiff does not provide the Court with the correct standard applicable to this case. An ALJ may recontact a treating physician to help resolve insufficiencies or inconsistencies if the medical record is insufficient or inadequate. 20 C.F.R. § 404.1520b. Evidence is insufficient if it "does not contain all of the information that [the Administration] need[s] to make [its] determination or decision." 20 C.F.R. § 404.1520b(b). Evidence is inconsistent if it "conflicts with other evidence, contains an internal conflict, is ambiguous, or when the medical evidence does not appear to be based on medically acceptable clinical or laboratory diagnostic techniques." *Id.* In both scenarios, the agency will attempt to make a disability determination based on the information it has. *See id.* at (b)(1)(2). Thus, an ALJ will only recontact a treating source if he or she cannot make a disability

determination based on the evidence already before him or her. *See Skinner v. Astrue*, 478 F.3d 836, 843 (7th Cir. 2007); 20 C.F.R. § 404.1520b; *see also Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) ("An ALJ need recontact medical sources only when the evidence received is inadequate to determine whether the claimant is disabled.").

Here, the ALJ made a disability determination and did not indicate that the record was inadequate to make that determination. Moreover, Timothy does not explain why the ALJ should have determined the evidence in the record to be so insufficient or inconsistent as to render her unable to make a disability determination.

Accordingly, the Court finds that the ALJ's decision to discount Dr. Banks's medical opinion was supported by substantial evidence.

### B.  Mental Limitations in Residual Functional Capacity

Timothy next argues that the ALJ committed reversible error by failing to adequately account for his limitations in concentration, persistence, and pace in the residual functional capacity assessment and in the hypothetical question presented to the vocational expert at the 2018 hearing. [Dkt. 14 at 23.]

On April 12, 2010, state agency psychological consultant Ken Lovko, Ph.D. reviewed Timothy's medical records and completed the Psychiatric Review Technique. [Dkt. 8-10 at 10 (R. 495).] He determined that Timothy had mild limitations in completing daily living activities and maintaining social functioning and moderate limitations in maintaining concentration, persistence, or pace. [Dkt.

8-10 at 20 (R. 505).] Specifically, Dr. Lovko noted that Timothy was moderately limited in his ability to understand and remember detailed instructions; and the ability to complete a normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." [*Id.* at 24-25 (R. 509-10).]

In the 2014 ALJ opinion, the ALJ noted that she gave significant weight to the state agency psychological consultant opinions, including Dr. Lovko's, because those opinions were consistent with Timothy's conservative treatment and with the consultative examinations. [Dkt. 8-2 at 41 (R. 40).] In her hypothetical to the vocational expert, the ALJ asked the vocational expert whether there were jobs for someone with "the capacity to understand, remember, and carry out . . . simple, routine tasks . . . [where] the individual has the capacity to use commonsense understanding." [Dkt. 8-15 at 21 (R. 862).]

The District Court determined in the 2017 opinion that the ALJ did not properly account for Timothy's moderate limitations in concentration, persistence, and pace, both in the RFC analysis and in the hypotheticals provided to the vocational expert. [Dkt. 8-15 at 21 (R. 862).] The opinion reminded the SSA that the Seventh Circuit frequently remands cases on this point because ALJs use phrases like "simple, routine tasks" that do not adequately represent a claimant's limitations. [*Id.*]

On remand, ALJ de la Torre reevaluated Timothy's mental limitations. In her June 29, 2018 opinion, she concludes that Timothy has mild, rather than moderate,

limitations in concentration, persistence, or pace. The ALJ arrived at this conclusion by giving "some weight" to Dr. Lovko's opinion, but greater weight to Dr. Brooks's recommendation that Timothy only has mild limitations in concentration, persistence, or pace. [Dkt. 8-13 at 12 (R. 672).] Whereas Dr. Lovko had only reviewed Timothy's medical records up through April 2010, Dr. Brooks was able to review the full span of Timothy's medical history. *See Young v. Barnhart*, 362 F.3d at 1001-02. Even with giving great weight to Dr. Brooks's opinion, the ALJ does impose a more restrictive RFC than Dr. Brooks recommended. [Dkt. 8-13 at 12 (R. 672).]

Utilizing the proposed RFC, the ALJ submitted a hypothetical to the vocational expert. The ALJ indicated that the hypothetical claimant: could understand, remember, and carry out short, simple repetitive instructions; could sustain attention and concentration for two-hour periods at a time in an eight hour work day on short, simple, repetitive tasks; could persist and main pace for two hours at a time in an eight hour work day in order to complete those tasks; could use judgment in making work-related decisions consistent with that type of work; required an occupation with a set routine and procedures with few changes during the work day; and required an occupation with occasional worker contact and supervision and no contact with the public. [Dkt. 8-13 at 79-80 (R. 739-40).] Timothy's attorney asked a follow-up question, inquiring as to whether an average worker with no limitations could maintain concentration, persistence, and pace for two hours at a time: the vocational expert responded in the affirmative, that a

requirement for a worker to maintain concentration, persistence, and pace for two hours at a time is consistent with unskilled work. [Dkt. 8-13 at 81-82 (R. 741-42).]

Here, Timothy argues that the ALJ failed to adequately account for his limitations in concentration, persistence, and pace, both in the RFC analysis and in the hypotheticals presented to the vocational expert. As an initial matter, Timothy argues that the ALJ is attempting to sidestep the Court's previous remand order that the vocational expert was to be properly instructed as to Plaintiff's moderate limitations in concentration, persistence, and pace. [Dkt. 14 at 24-25.] Even with changing Timothy's limitations from moderate to mild, he argues, the ALJ failed to account for any limitations in the RFC and hypothetical.[4] Specifically, Timothy asserts, the ALJ's RFC and hypothetical that limits Timothy to maintaining concentration, persistence, and pace for two hours is not actually a limitation; it is the normal requirement for an average worker with no mental impairment. [Dkt. 14 at 25-26.] Additionally, Timothy argues that it was improper and not supported by substantial evidence for the ALJ to reduce Timothy's limitations from moderate to mild. [Dkt. 14 at 27.]

The Commissioner responds that the ALJ properly relied on Dr. Brooks's medical opinion in determining that Timothy had mild, rather than moderate, limitations in concentration, persistence, or pace. [Dkt. 18 at 13.] The Commissioner explains that the ALJ added an additional limitation for simple routine tasks,

---

[4] At the 2018 hearing, the vocational expert testified at the hearing that a normal unskilled worker is required to maintain concentration, persistence, and pace for two hours at a time in a work day. [Dkt. 8-13 at 81-82 (R. 741-42).]

beyond the limitations assessed by Dr. Brooks. The Commissioner argues that Chief Judge Magnus-Stinson did not make a factual ruling that Timothy had moderate limitations in concentration, persistence, or pace. Instead, on remand, the Commissioner maintains that the ALJ obtained a medical expert to better advise the agency as to Timothy's mental limitations. [Dkt. 18 at 15.]

In reply, Timothy argues that the Commissioner did not respond to his argument that the vocational expert testified that maintaining concentration, persistence, or pace for two hours reflected an unimpaired employee. Additionally, the Plaintiff argues that the Seventh Circuit has held numerous times that vague language about "simple, repetitive tasks" does not adequately reflect issues with concentration, persistence, or pace. [Dkt. 20 at 7.]

A claimant's residual functional capacity is the most he can do despite the limiting effects of his impairments. 20 C.F.R. § 404.1545(a). The ALJ must consider all medically determinable impairments when assessing a claimant's RFC. 20 C.F.R. § 404.1545(a)(2); *see also Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014) ("As a general rule, . . . the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record."). When evaluating medical opinions to determine which impairments must be incorporated into the RFC assessment, ALJs have to offer good reasons for the weight they accord, or don't accord, to medical opinions. *See*, *e.g., Walker v. Berryhill*, 900 F.3d 479, 485 (7th Cir. 2018) (treating physician); *Britt v. Berryhill*, 889 F.3d 422, 426 (7th Cir. 2018)

36

(consultative examiner); *Campbell v. Astrue*, 627 F.3d 299, 309 (7th Cir. 2010) (reviewing doctor).

The ALJ in this case concluded that Timothy had only mild limitations with regard to concentration, persistence, or pace by discounting state agency physician Dr. Lovko's assessment because it only considered Timothy's medical history from April 12, 2010 and earlier and did not have the benefit of considering the later evidence of poor effort and malingering. S*ee Campbell v. Astrue*, 627 F.3d at 309 (ALJ's decision to rely on opinions of state agency psychologist and psychiatrist was not supported by substantial evidence where the physicians did not review the extensive subsequent treating records that explicitly contradicted their conclusions). Although it may have been unexpected for the ALJ to further reduce the previous ALJ's determination of Timothy's difficulties with concentration, persistence, or pace from moderate to mild, it cannot be said that such a decision was improper. Rather, the decision to deem Timothy only mildly limited was supported by the evidence and adequately explained by the ALJ in her opinion. *See* Social Security Ruling 16-3p, 2017 WL 5180304, at *2 (ALJs must explain why a reported limitation is or is not consistent with the evidence in the record).

The ALJ relied on Dr. Brooks's medical opinion that Timothy had only mild difficulties with concentration persistence, or pace in evaluating Timothy's RFC and assigning mild mental limitations. To ensure that a proper evaluation of Timothy's mental impairment occurred on remand, the ALJ obtained an independent medical expert to review the record and provide an opinion as to Timothy's limitations. As

discussed earlier, the ALJ's reliance on Dr. Brooks's medical opinion was proper and allowed under the relevant case law and regulations. Additionally, the ALJ relied on Dr. Brooks's medical opinion, but determined that an additional mental restriction was warranted beyond what Dr. Brooks had assessed. Even if Dr. Brooks's determination that Timothy could maintain concentration, persistence, or pace for two hours reflected the abilities of an unimpaired employee, that was his conclusion after reviewing the medical evidence and listening to Timothy's testimony and the ALJ's decision to rely on that conclusion was proper.

Accordingly, the Court finds no basis to disturb the ALJ's assigned mental limitations in Timothy's RFC because they were supported by substantial evidence.

## V.    Conclusion

For the reasons detailed herein, this court **AFFIRMS** the ALJ's decision denying Plaintiff benefits.

So ORDERED.

Date: 9/20/2019

*Doris L. Pryor*

Doris L. Pryor
United States Magistrate Judge
Southern District of Indiana

Distribution:

All ECF-registered counsel of record.